Third Division

Filed:  February 5, 2003

No. 1-01-3937

EARLEAN JINKINS, individually and as Administrator )   Appeal from the 

of the Estate of George Jinkins, Deceased, )   Circuit Court of 

 )   Cook County.

Plaintiff-Appellant, )

)

v. )    

)

DR. CHOONG LEE and PAULETTE MEDLIN, )   

)   

Defendants-Appellees, )   

)

and )

)

EVANGELICAL HOSPITALS CORPORATION, )

d/b/a EHS CHRIST HOSPITAL AND MEDICAL )

CENTER, a/k/a CHRIST HOSPITAL AND MEDICAL )   Honorable

CENTER, DR. JEAN E. MOTZNY, DR. DAN SACHS, )   Barbara Ann McDonald,

L. KEMP and ROBERT HARWOOD, M.D., )   Judge Presiding. 

Defendants.

JUSTICE HOFFMAN delivered the opinion of the court:

The plaintiff, Earlean Jinkins, individually and as independent administrator of the estate of her deceased husband, George Jinkins (George), brought a medical malpractice action against the defendants, Dr. Choong Lee and Paulette Medlin, two employees of the John J. Madden Mental Health Center (Madden), a State of Illinois mental health care facility.  The defendants subsequently filed a motion for summary judgment, arguing, 
inter
 
alia
, that the circuit court lacked subject matter jurisdiction over the claims against them based on the doctrine of sovereign immunity.  The circuit court granted summary judgment in favor of the defendants, and the plaintiff brought the instant appeal.  The issues before us are whether the trial court erred, as a matter of law, in finding that the doctrine of sovereign immunity applied and, alternatively, whether we should affirm the trial court's entry of summary judgment in the defendants' favor because they are shielded from liability under the doctrine of public officials' immunity.  For the reasons which follow, we reverse and remand this case to the circuit court for further proceedings.    

On June 20, 1996, George was admitted to the emergency room at Christ Hospital and Medical Center (Christ Hospital), a private hospital, and diagnosed as being acutely psychotic and exhibiting suicidal behavior.  George was later transferred to Madden, where Dr. Lee, a psychiatrist, and Paulette Medlin, a psychologist, released him after evaluating him and referring him for outpatient treatment.  An hour after being released, George committed suicide by shooting himself in the head. 

The plaintiff filed a complaint in the circuit court containing four counts which alleged medical malpractice against Dr. Lee and Medlin.
(footnote: 1)  The plaintiff alleged, 
inter
 
alia
, that Dr. Lee and Medlin breached their duty to properly examine, diagnose, monitor, and treat George and to admit him to Madden, which proximately caused George's death.   

In his answer to the plaintiff's complaint, Dr. Lee denied that he examined, diagnosed, treated, or cared for George, and admitted only that he interviewed and evaluated him.  Dr. Lee and Medlin did admit that, in providing medical care and services to George, it was their duty to apply the knowledge and skill ordinarily possessed by well-qualified heath care professionals in the same or similar communities.  As affirmative defenses, the defendants alleged that George had failed to: (1) follow the medical treatment suggested by the attending health care professionals at Madden and (2) refrain from engaging in conduct which was likely to cause injury or death to himself.

The pleadings, deposition testimony, and medical records contained in the record reveal the following facts.  Lorenzo Norwood, a friend of George's, testified that George began exhibiting strange behavior about three or four months before he committed suicide.  After one particular incident during which George intentionally jumped in front of a passing car, Norwood, another friend named Maurice Abernathy, and George's mother, Florine Jinkins (Florine), took George to Christ Hospital. 

At the hospital, Dr. Daniel Sachs diagnosed George as acutely psychotic and exhibiting suicidal behavior.  A petition for involuntary admission was prepared on behalf of George pursuant to section 3-601 of the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/3-601 (West 1996)), and signed by Florine.  The petition alleged that George was hearing voices, thought he was being shot at, thought birds were talking to him, and believed he was being poisoned.  Attached to the petition was a certificate prepared by Dr. Sachs stating that George was mentally ill, and because of his illness, was reasonably expected to inflict serious physical harm on himself or another in the near future.  Dr. Sachs testified that George was subject to involuntary admission and in need of immediate hospitalization based on comments made by Florine and either Abernathy or Norwood, to the effect that George repeatedly tried to kill himself by walking in front of cars stating, "I just want to go."  Pursuant to the Mental Health Code, after a petition for involuntary admission and accompanying certificate are filed on behalf of a patient, a psychiatrist must evaluate the patient and execute a second certificate in order for the patient to be involuntarily held longer than 24 hours at a mental health facility.  405 ILCS 5/3-602 (West 1996); 405 ILCS 5/3-610 (West 1996).    

Social worker Leonard Kemp informed Dr. Sachs that George was going to be transferred to Madden to be evaluated by a psychiatrist.  However, George was not transferred immediately because his blood alcohol level was too high.  He remained at Christ Hospital until approximately 6 a.m.  During this time, George appeared hostile and agitated, and was subsequently given Haldol and placed in restraints.  At 7:30 a.m., George arrived at Madden, accompanied by Florine and the plaintiff. 

Dr. Lee testified that he was working as an intake psychiatrist at Madden when George was transferred to the facility.  He explained that the intake psychiatry position exists only in State hospitals and that, in his opinion, such positions do not exist in private hospitals.  Dr. Lee explained that, as the intake psychiatrist, it was his job to examine individuals brought to Madden and decide whether they needed psychiatric care.  If so, Dr. Lee hospitalized the patient, and if not, he referred the patient to an outpatient clinic.  Dr. Lee stated that he exclusively did intake work and did not provide long term psychiatric care for any patient.   

Before interviewing George, Dr. Lee reviewed the records from Christ Hospital, including the petition for involuntary admission.  The doctor acknowledged that he knew George was given Haldol the previous night.  Dr. Lee stated that, during the interview, George appeared to be calm and cooperative and showed no symptoms of psychosis or paranoid ideations.  George told Dr. Lee that he was brought to Christ Hospital because he was bleeding, hyperventilating, and intoxicated.  Dr. Lee asked George about the statements contained in the petition for involuntary admission and accompanying certificate, alleging that he was hearing voices, thought he was being poisoned, and attempted to commit suicide by running in front of cars.  George denied the allegations and stated that he wanted to go home and spend time with his family. According to Dr. Lee, the plaintiff told him that her husband was not suicidal, that he did not need to be in the hospital, and that she wanted to take him home.  Florine also told Dr. Lee that George was doing better and that she would rather take him home.  

Dr. Lee diagnosed George with an "alcohol-related disorder NOS" (not otherwise specified) and alcohol abuse.  According to Dr. Lee, he made the diagnosis because, by the time George left Christ Hospital, his alcohol level had decreased and his psychiatric symptoms had disappeared.  Dr. Lee stated that, due to the change in George's behavior while at Madden, he did not feel that George needed to be involuntarily admitted.  The doctor did not believe that George was suicidal, but acknowledged there was some low suicidal risk.  Dr. Lee stated that he classified George's suicidal risk as "low" because he had a supportive family, he had not attempted suicide in the past, and did not have any prior history of psychiatric hospitalization.  

Dr. Lee testified that the first certificate for involuntary admission was filled out at Christ Hospital.  He explained that it was his responsibility to write a second certificate for George if he believed it to be necessary; however, he did not believe George was "certifiable."  Dr. Lee stated that, in his opinion, George needed follow-up observation and, as a consequence, he referred George to a community mental health center for outpatient treatment.  However, George refused the referral.  Finally, Dr. Lee acknowledged in his deposition that George was his patient during the intake procedure.  When asked specifically whether he was George's psychiatrist and George was his patient, Dr. Lee replied affirmatively. 

Medlin testified that she was licensed as a clinical professional counselor and classified as a "psychologist three" at Madden.  She stated that she worked in intake and that her job entailed gathering information about a patient to determine if he or she should be admitted to the facility.  Medlin interviewed George, the plaintiff, and Florine.  According to Medlin, both the plaintiff and Florine told her that George was not suicidal and that he should return home.  Florine also told Medlin that George's behavior was related to his alcohol consumption.  Medlin stated that, although she was not responsible for deciding whether a patient should be admitted into Madden, she did not feel that George needed to be committed.  

Dr. Syed Ali, a psychiatrist and expert witness for the defendants, testified that he reviewed the policies and procedures from Madden.  Dr. Ali stated that the evaluation process, standards, and procedures that are followed to involuntarily commit a patient are the same in a private hospital as they are in a State hospital.  Dr. Ali further testified that intake psychiatrists must first evaluate the patient, which would involve using his or her training and experience and applying the standard of care that a psychiatrist would use in making an evaluation.  According to Dr. Ali, the applicable standard of care in deciding whether George should have been admitted to Madden required that Dr. Lee make a diagnosis, determine the proper treatment plan, gather information from as many resources as were available to him, and establish a plan to ensure George's well-being and safety.  According to the doctor, it was also Dr. Lee's duty as a psychiatrist to assess whether or not George presented an imminent threat of harming himself.  Dr. Ali testified that George's symptoms could be explained by alcohol withdrawal, and that many people become paranoid as a result thereof.  Finally, Dr. Ali stated that most patients who come to an institution with a petition for involuntary admission and certificate are admitted to the facility for observation.       

Dr. Hasina Javed, a psychiatry resident who was working at Madden at the relevant time, testified that most patients who arrived with a certificate were admitted to Madden.  Dr. Javed stated that George's symptoms were typical of a person with an organic psychosis, meaning someone who is intoxicated, paranoid, and delusional.  

George was discharged from Madden at approximately 10 a.m. on June 21, 1996.  Less than an hour later, he shot himself in the head and was taken back to Christ Hospital, where he died.  

The defendants, Dr. Lee and Medlin, filed a motion for summary judgment, arguing that the circuit court lacked subject matter jurisdiction over the claims asserted against them based on the doctrine of sovereign immunity.  Relying on this court's decision in 
Kilcoyne v. Paelmo
, 204 Ill. App. 3d 139, 562 N.E.2d 231 (1990), the trial court granted their motion and made the requisite findings under Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)).  Thereafter, the plaintiff filed a timely notice of appeal.  

Summary judgment is a drastic means of disposing of litigation (
Happel v. Wal-Mart Stores, Inc.
, 199 Ill. 2d 179, 186, 766 N.E.2d 1118 (2002)), and should be granted only when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" (735 ILCS 5/2-1005(c) (West 1998)).  Appellate review of an order granting summary judgment is 
de
 
novo
.  
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154 Ill. 2d 90, 102, 607 N.E.2d 1204 (1992).  In reviewing an order granting summary judgment, we construe the evidentiary matter strictly against the moving party and in the light most favorable to the nonmoving party.  
Espinoza v. Elgin, Joliet, & Eastern Ry. Co.
, 165 Ill. 2d 107, 113, 649 N.E.2d 1323 (1995).  A triable issue of fact exists where there is a dispute as to a material fact or where, the facts are undisputed but reasonable minds might differ in drawing inferences from those facts.  
Petrovich v. Share Health Plan of Illinois, Inc.
, 188 Ill. 2d 17, 31, 719 N.E.2d 756 (1999).   

Article XIII, section 4 of the Illinois Constitution abolished sovereign immunity "[e]xcept as the General Assembly may provide by law." (Ill. Const. 1970, art. XIII, §4.)  Pursuant to this grant of authority, the legislature enacted the State Lawsuit Immunity Act (745 ILCS 5/1 
et
 
seq
. (West 1998)), which states that "[e]xcept as provided in *** 'AN ACT to create the Court of Claims ***', *** the State of Illinois shall not be made a defendant or party in any court."  745 ILCS 5/1 (West 1998).

The Court of Claims Act (705 ILCS 505/1 
et
 
seq
. (West 1998)) established the Court of Claims and gave it exclusive jurisdiction to hear certain matters, including the following actions:

"All claims against the State for damages in cases sounding in tort, if a 

like cause of action would lie against a private person or corporation in a civil suit, 

*** provided, that an award for damages in a case sounding in tort *** shall not 

exceed the sum of $100,000 to or for the benefit of any claimant. ***" 705 ILCS 

505/8(d) (West 1998).

The determination of whether an action is actually directed against the State depends upon an analysis of two factors; the issues involved and the relief sought, rather than the formal designation of the parties.  
Healy v. Vaupel
, 133 Ill. 2d 295, 308, 549 N.E.2d 1240 (1990); 
Currie v. Lao
, 148 Ill. 2d 151, 158, 592 N.E.2d 977 (1992).  Therefore, the prohibition "'against making the State of Illinois a party to a suit cannot be evaded by making an action nominally one against the servants or agents of the State when the real claim is against the State of Illinois itself and when the State of Illinois is the party vitally interested.'"  
Healy
, 133 Ill. 2d at 308, quoting 
Sass v. Kramer
, 72 Ill. 2d 485, 491, 381 N.E.2d 975 (1978). 

Illinois courts have established three criteria to consider in determining whether an action is in fact directed against the State and must be brought in the Court of Claims: 

"[when] 'there are (1) no allegations that an agent or employee of the State

acted beyond the scope of his authority through wrongful acts; (2) the duty alleged 

to have been breached was not owed to the public generally independent of the fact

 of State employment; and (3) where the complained-of actions involve matters 

ordinarily within that employee's normal and official functions of the State.'"  
Healy
, 

133 Ill. 2d at 309, quoting 
Robb v. Sutton
, 147 Ill. App. 3d 710, 716, 498 N.E.2d 

267 (1986).

Further, an action will be found to be a claim against the State where a judgment for the plaintiff "could operate to control the actions of the state or subject it to liability."  
Currie
, 148 Ill. 2d at 158. 

The plaintiff contends that sovereign immunity does not apply in this case because the second criterion articulated in 
Healy
 and 
Robb
, namely, that the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment, was not met in this case.  The plaintiff argues that the duty the defendants owed to George did not arise from the fact that they were employees of the State; rather, it arose out of the relationship between George as a patient and the defendants as his professional health care providers.  We agree. 

In 
Madden v. Kuehn
, 56 Ill. App. 3d 997, 372 N.E.2d 1131 (1978), the plaintiff filed a wrongful death action against the estate of the deceased physician, who had been employed by the State, alleging that the plaintiff's decedent died as a result of the physician's failure to diagnose and treat his hereditary disease while the decedent was incarcerated.  The court held that sovereign immunity did not apply because the physician was alleged to have breached duties "which every physician owes his patient, rather than obligations incurred solely by virtue of holding a public office."  
Madden
, 56 Ill. App. 3d at 1001.  Following the reasoning employed in 
Madden
, the court in 
Watson v. St. Annes Hospital
, 68 Ill. App. 3d 1048, 386 N.E.2d 885 (1979), held that sovereign immunity did not shield the defendants, all of whom were State-employed doctors or nurses, from liability in four consolidated medical malpractice cases.  In so finding, the court quoted the language in 
Madden
 as to the defendant's duty being that duty which every physician owes to every patient.  
Watson
, 68 Ill. App. 3d at 1053. 

In 
Healy v. Vaupel
, 133 Ill. 2d 295, 549 N.E.2d 1240 (1990), the supreme court addressed the holdings in 
Madden
 and 
Watson
 in the context of a suit in which the plaintiff, a member of the Northern Illinois University gymnastics team, sought recovery from two athletic directors, a gymnastics coach, and a gymnastics team trainer employed by the university for injuries sustained during university-sponsored gymnastics activities.  In concluding that sovereign immunity applied, the court noted that 
Madden
 had been criticized in a law review article "as working an improper severance of the relationship between master and servant," but it expressly refused to overrule 
Madden
.  
Healy
, 133 Ill. 2d at 312.  Instead, the court declined to extend 
Madden
 to the case before it, noting as follows: 

"Essential to the court's holding in 
Madden
 was the view that the duty of 

care owed by the physician arose independently of his status as an employee of 

the State; that conclusion may be said to rest on the special nature of the doctor-

patient relationship.  We do not believe that the same conclusion may be reached 

here. ***  Whatever duty was owed by the defendants to the plaintiff existed 

because of the plaintiff's status as a student and her participation in university-

sponsored activities."  
Healy
, 133 Ill. 2d at 313.           

In 
Kiersch v. Ogena
, 230 Ill. App. 3d 57, 595 N.E.2d 696 (1992), a student at a State university filed a medical malpractice action against a university-employed physician who had treated her.  In deciding whether sovereign immunity applied to the physician, the 
Kiersch
 court looked to the supreme court's decision in 
Currie v. Lao
, 148 Ill. 2d 151, 592 N.E.2d 977 (1992), a case in which the plaintiff filed a negligence action against an Illinois State trooper for damages sustained when the on-duty trooper's patrol car collided with the plaintiff's truck.  The 
Currie
 court stated that, in deciding whether a State employee's on-the-job negligence is immunized, the court must analyze "the source of the duty the employee is charged with breaching in committing the allegedly negligent act."  
Currie
, 148 Ill. 2d at 159.  The supreme court held that sovereign immunity did not apply because the defendant's duty to the plaintiff arose, not as a result of his employment as a State trooper, but as a result of his status as the driver of an automobile on a public roadway.  
Currie
, 148 Ill. 2d at 161-62.  The 
Kiersch
 court specifically stated that it viewed the supreme court's decision in 
Currie
 as reaffirming the appellate court's analysis in both 
Madden
 and 
Watson
 with respect to the independent source of the duty alleged to have been breached.  
Kiersch
, 230 Ill. App. 3d at 62.  In holding that sovereign immunity did not shield the State-employed physician from immunity, the 
Kiersch
 court stated that, "[a]s in 
Madden
 and 
Watson
, the duty plaintiff alleges that defendant breached in this case arose independently of her State employment and is no different than that duty which any physician owes to her patient."  
Kiersch
, 230 Ill. App. 3d at 63. 

The court in 
Cottrill v. Russell
, 253 Ill. App. 3d 934, 625 N.E.2d 888 (1993), applying the holdings in 
Currie
 and 
Kiersch
, concluded that sovereign immunity did not bar a State university student's medical malpractice action against a university-employed physician.  In so holding, the court stated, "the duty plaintiff alleges defendant breached arose independent of his State employment and is the duty every physician owes to his patient, rather than an obligation incurred by virtue of holding a public office."  
Cottrill
, 253 Ill. App. 3d at 943.  

In 
Janes v. Albergo
, 254 Ill. App. 3d 951, 626 N.E.2d 1127 (1993), the guardian filed an action on behalf of the minor plaintiff, a patient at Madden, against several psychiatrists and other medical care professionals after the plaintiff was sexually abused by another patient at the facility.  On appeal, the defendants urged the court not to follow 
Madden
 and 
Watson
.  After considering the holdings in those cases, along with 
Healy
, 
Kiersch
, and 
Currie
, the 
Janes
 court held that sovereign immunity did not apply because the duties owed by the Madden employees derived from their professional relationships with their patients.  
Janes
, 254 Ill. App. 3d at 964.  The court stated as follows:

"Manifestly, the doctor's duties and the patient's correlative rights 

are inherent in the doctor-patient relationship and are derived from the 

standards imposed by the profession itself, including certification and 

licensing requirements and disciplinary procedures.  A physician's duty is to 

exercise the same degree of knowledge, skill, and care which a reasonably well-

qualified physician in the same or similar community would use under similar 

circumstances.  [citation omitted].  That duty is derived from the doctor's status 

as a licensed physician and is not dependent upon the physician's employment 

status.  [citation omitted].  Accordingly, under this rationale, the duty applies 

regardless of whether a physician is in private practice, is employed by a private 

facility, or is employed by a governmental entity."  
Janes
, 254 Ill. App. 3d at 964.      

The defendants acknowledge that 
Madden
 and its progeny stand for the proposition that, where a patient sues State-employed health care professionals for medical malpractice based on matters relating to the proper care and treatment of the patient, sovereign immunity does not apply.  They argue, however, that the defendants in this case did not provide George with treatment; rather, they "merely screened" him for the purpose of determining whether to involuntarily admit him to Madden.  The defendants maintain that, as such, they did not owe George those duties inherent in the health care provider-patient relationship, and accordingly, the rule stated in 
Madden
 does not apply.  The defendants assert that their argument in this regard is supported by the decision in 
Kilcoyne v. Paelmo
, 204 Ill. App. 3d 139, 562 N.E.2d 231 (1990).   

In 
Kilcoyne
, the plaintiff filed a petition for involuntary admission of her husband on the grounds that he had threatened to harm her and to kill her father.  Pursuant to a court order, the plaintiff's husband was admitted to a State mental health facility to be examined and evaluated.  That examination disclosed that he was mentally ill and reasonably expected to inflict serious physical harm upon himself or another.  
Kilcoyne
, 204 Ill. App. 3d at 141.  Before the scheduled court hearing on the petition, the plaintiff's husband requested voluntary admission to the facility.  The circuit court granted this request and dismissed the plaintiff's petition for involuntary admission.  
Kilcoyne
, 204 Ill. App. 3d at 141.  The plaintiff's husband subsequently exercised his statutory right to be discharged from the facility and, upon release, gained entry into the plaintiff's residence, stabbed her father to death, and held her two children hostage at knife point.  The plaintiff brought suit against the mental health care professionals employed by the facility, claiming, 
inter
 
alia
, that they negligently released her husband after failing to properly diagnose and treat him.  
Kilcoyne
, 204 Ill. App. 3d at 142.  The circuit court granted the defendants' motion for summary judgment finding that the action was jurisdictionally barred.  In finding that the doctrine of sovereign immunity barred the action at issue, the court in 
Kilcoyne
 found that 
Madden
 and 
Watson
 were factually distinguishable in that the duties involved in those cases were those "'which every physician owes his patient, rather than obligations incurred solely by virtue of holding a public office.'" 
Kilcoyne
, 204 Ill. App. 3d at 144, quoting 
Madden
, 56 Ill. App. 3d at 1001.  In distinguishing 
Madden
 and 
Watson
, the court further stated that:

"The services performed by the mental health care professionals here

 involved the determination of whether a person should be institutionalized by the 

State and the additional obligations incurred in making this determination.  We do

not believe that these duties equate with those duties generally owed to patients by

 their doctors.  The alleged duties here arose solely by virtue of defendants' State 

employment [citation omitted]. Furthermore, the duty allegedly owed here was to 

a third party, whereas in 
Madden
 and 
Watson
 the duty was directly owed to the

 patient."  
Kilcoyne
, 204 Ill. App. 3d at 144-145.

The court in 
Kilcoyne
 also found that sovereign immunity applied because a judgment for the plaintiff could operate to control the actions of the State, as it would "effectively require the State to redraft its policies and guidelines regarding the incarceration and release of mental patients."  
Kilcoyne
, 204 Ill. App. 3d at 145. 

We decline to apply the holding in 
Kilcoyne 
to the facts of this case for a number of reasons.  First, we disagree that the application of the doctrine of sovereign immunity in a health care malpractice context is in any way determined by whether the duty which the defendant is alleged to have breached is owed to the patient or some third person.  The resolution of the issue of the applicability of the doctrine of sovereign immunity in such a case turns on the source of duty, not to whom it is owed.  If the duty springs from the defendant's status as a State employee, then the doctrine is applicable.  See 
Healy
, 133 Ill. 2d at 313.  If, on the other hand, the duty arises not from the defendant's status as a State employee but, rather, independently from a health care provider-patient relationship, the doctrine is inapplicable.  See 
Janes
, 254 Ill. App. 3d at 964; 
Cottrill
, 253 Ill. App. 3d at 943; 
Kiersch
, 230 Ill. App. 3d at 63; 
Watson
, 68 Ill. App. 3d at 1053; 
Madden
, 56 Ill. App. 3d at 1001.  

Secondly, we do not believe that the services performed by health care professionals employed by the State in determining whether to involuntarily commit an individual to a State-operated mental health facility are any different than those performed by health care professionals in the private sector.  Our conclusion in this regard is supported by the provisions of the Mental Health Code authorizing involuntary commitments to mental health facilities (see 405 ILCS 5/3-600-611 (West 1996)) which are defined as "
any licensed private hospital
, institution, or facility or section thereof, and 
any facility, or section thereof, operated by the State
 or a political subdivision thereof for the treatment of persons with mental illness and includes all hospitals, institutions, clinics, evaluation facilities, and mental health centers which provide treatment for such persons."  (Emphasis added.)  405 ILCS 5/1-114 (West 1996).  

Third, the 
Kilcoyne
 court held that the duties owed by State-employed health care professionals in determining whether to institutionalize a patient do not "equate with those duties generally owed to patients by their doctors."  
Kilcoyne
, 204 Ill. App. 3d at 144-45.  From the opinion, however, we do not know the basis for such a conclusion.  In this case, we have Dr. Lee's admission that George was his patient, the admissions of both Dr. Lee and Medlin that, in providing medical care and services to George, they were obligated to apply the knowledge and skill that well-qualified health care professionals would apply, and the testimony of the defendants' expert witness, Dr. Ali, that the evaluation process, standards, and procedures that are followed to involuntarily commit a patient to a State hospital are the same as those in a private hospital.  

The standard of care by which a health care professional's conduct is to be measured is generally established by expert testimony.  See 
Purtill v. Hess
, 111 Ill. 2d 229, 241-42, 489 N.E.2d 867 (1986); 
Walski v. Tiesenga
, 72 Ill. 2d 249, 255-56, 381 N.E.2d 279 (1978).  The evidentiary material in the record before us is more than sufficient to support the conclusion that the duty owed by the defendants and the standard of care by which their conduct is to be measured is no different than that which would be applicable to health care professionals employed by a private institution. 

The question of whether the defendants owed a duty to George which was independent of their State employment can only be determined in the context of the underlying facts of the case.  The defendants' own expert witness, Dr. Ali, testified that it was Dr. Lee's duty as a psychiatrist to determine whether George presented an imminent threat of harming himself.  According to Dr. Ali, Dr. Lee was first required to evaluate George, which would involve Dr. Lee using his training and experience as a psychiatrist.  Dr. Ali further testified that, in deciding whether George should be admitted, the proper standard of care required that Dr. Lee make a diagnosis, determine a proper treatment plan, gather information from as many resources as were available to him, and establish a plan to ensure George's well-being and safety.  Dr. Lee testified that his job was to examine individuals to determine whether they needed hospitalization.  The record also contains Dr. Lee's statement in which he unequivocally acknowledged that he was acting as a psychiatrist and that George was his patient.  Further, as noted earlier, the defendants admitted in their answer to the plaintiff's complaint that, in providing medical care and services to George, it was their duty to apply the knowledge and skill ordinarily possessed by well-qualified health care professionals.  Because the facts of record, when viewed in their light most favorable to the plaintiff, support the conclusion that the defendants had a health care provider-patient relationship with George, we believe, consistent with the reasoning in 
Madden
, 
Watson
, and their progeny, that the duty of care which the defendants owed to George arose independent of their State employment. 

The defendants also argue that a judgment in favor of the plaintiff "could operate to control the actions of the State because it could prompt the State to require that its employees involuntarily admit individuals to State mental health facilities in virtually every instance, regardless of the need for such an admission, as a precautionary measure in order to avoid future judgments based on decisions not to involuntarily admit individuals."  However, we believe that such an argument is based on mere speculation.  Our holding today merely recognizes the well-established duty that a physician or other health care professional owes toward his or her patient.  See 
Janes
, 254 Ill. App. 3d at 951.   

The defendants also make a cursory argument that the State is the real party in interest because it is required by statute to indemnify the State defendants (see 5 ILCS 350/2 (West 1998)), and any judgment will be paid out of the State Treasury.  A similar argument was made and rejected in 
Kiersch
.  The 
Kiersch
 court stated:

"We also reject defendant's argument that [Illinois State University's] 

provision for legal representation and indemnification of its employees somehow 

transforms 
all suits
 against ISU employees in their individual capacities into suits

 against the State, requiring that such suits be brought in the Court of Claims.  In

response to this argument, plaintiff correctly points out that defendant confuses 

liability
 with 
indemnity
 -- that is, defendant tries to equate ISU's decision to 

indemnify its employees with direct liability of ISU for its employees' negligent 

conduct.  The two are not the same, and the decision of ISU to indemnify its 

employees does not deprive the circuit courts of subject-matter jurisdiction over 

claims otherwise properly brought in the circuit court."  
Kiersch
, 230 Ill. App. 3d

at 63-64.

We find no basis to deviate from the holding in 
Kiersch
 on this issue.  

For the foregoing reasons, we find that the trial court erred in granting the defendants' motion for summary judgment on the basis that it lacked jurisdiction over this action. 

Alternatively, the defendants contend that, even if the doctrine of sovereign immunity does not apply, we must nonetheless affirm the entry of summary judgment in their favor as they are shielded from liability under the common law doctrine of public officials' immunity.  The defendants concede that they did not raise this defense in the circuit court, and the court did not grant summary judgment on this basis.  Generally, a defense that is not raised in the trial court is regarded as waived and may not be raised for the first time on appeal.  See 
Bankier v. First Federal Savings & Loan Ass'n of Champaign
, 225 Ill. App. 3d 864, 872-73, 588 N.E.2d 391 (1992).  We recognize, however, that this rule applies insofar as the appellant is concerned; an appellee, on the other hand, may urge any point in support of the judgment on appeal, as long as a factual basis for such point was before the trial court.  
Shaw v. Lorenz
, 42 Ill. 2d 246, 248, 246 N.E.2d 285 (1969); 
Lorenz v. Siano
, 248 Ill. App. 3d 946, 949, 618 N.E.2d 666 (1993).  Because a factual basis exists in this case, we will consider the defendants' argument with respect to public officials' immunity.

In 
Currie
, the supreme court held:

"The common law doctrine of public officials' immunity dictates that public

 officials are immune from personal liability for their performance of discretionary 

duties. [citation omitted].  The doctrine is premised upon the principle that a public 

decisionmaker should not be subject to personal liability where he makes a decision 

based upon his perception of the public needs. [citation omitted].  The immunity 

attaches only to conduct by a public official that is discretionary, rather than 

ministerial, in nature. [citation omitted].  Further, it is well established that public

 officials' immunity does not apply to every discretionary act by an official but rather 

only to those acts which are unique to the particular public office. [citation omitted]."  

Currie
, 148 Ill. 2d at 166-67.         

The defendants rely on 
Anderberg v. Newman
, 5 Ill. App. 3d 736, 283 N.E.2d 904 (1972), a case in which physicians employed by the State were shielded from liability under the doctrine of public officials' immunity in a suit in which the plaintiff alleged that they negligently released a patient whom they knew to be suicidal.  We decline to follow 
Anderberg
.  We agree with the 
Anderberg
 court that a health care professional's decision to release a patient is a discretionary one.  However, as our supreme court stated in 
Currie
, public officials' immunity applies only to those discretionary acts which are unique to an official's particular public office.  As we have already concluded, the decision of whether to involuntarily admit a patient to a mental health facility is not a function that is unique to State employment.  For this reason, the defendants' reliance upon the doctrine of public officials' immunity in support of the judgment of the circuit court is misplaced.  

Based on the foregoing analysis, the summary judgment entered by the circuit court on the motion of the defendants, Dr. Lee and Medlin, is reversed and the cause is remanded for further proceedings.

Reversed and remanded.

HALL, J., concurs.

WOLFSON, J., dissents.

JUSTICE WOLFSON, dissenting:

Admittedly, this is a close case, but the majority's thoughtful analysis of the reported decisions does not lead me to the same conclusion.  I respectfully dissent.

A plaintiff cannot evade the application of sovereign immunity by bringing an action against an employee or agent of the State when the claim actually is against the State itself.  
Healy v. Vaupel
, 133 Ill. 2d 295, 308, 549 N.E.2d 1240 (1990).

One way to avoid sovereign immunity is to characterize the case as concerning a physician's duty to treat his patient, no matter the setting, and then cite 
Madden v. Kuehn
, 56 Ill. App. 3d 997, 372 N.E.2d 1131 (1978); and 
Watson v. St. Anne's Hospital
, 68 Ill. App. 3d 1048, 386 N.E.2d 885 (1979).  But I do not believe that is what this case is about.

Here, the defendants never treated George.  Nor did they place him for treatment in certain hospital programs, as the defendants did in 
Janes v. Albergo
, 254 Ill. App. 3d 951, 626 N.E.2d 1127 (1992).  They screened and evaluated George in order to decide whether to admit him involuntarily.  The source of the defendants' duty derived from their positions as mental health professionals charged by the State with making the administrative decision of whether to admit a patient against his or her will.  This is not the same as a general duty to treat patients.  The defendants' duty would not exist outside their employment by the State.  A judgment for the plaintiff in this case would operate to control the actions of the defendants' State employer.  This is particularly true where, as here, the plaintiff has filed an action against the State in the Court of Claims for the same injury alleged in this case.

It is true the Supreme Court in 
Healy
 expressly refused to overrule 
Madden
.  But it was not 

exactly an overwhelming vote of approval when the court said about the holding in 
Madden
: "Without commenting on the correctness of that decision, we decline to extend 
Madden
 to the present case."  
Healy
, 133 Ill. 2d at 313.

I do not understand the majority's disdain for 
Kilcoyne v. Paelmo
, 204 Ill. App. 3d 139, 562 N.E.2d 231 (1990).  There, as here, a State mental health facility was sued because it released a patient.  The patient then proceeded to kill his father-in-law.  There, as here, the plaintiff claimed this was a failure to properly diagnose and treat the patient.  The court held:

"The services performed by the mental health care professionals here involved the determination of whether a person should be institutionalized by the State and the additional obligations incurred in making this determination.  We do not believe that these duties equate with those duties generally owed to patients by their doctors.  The alleged duties here arose solely by virtue of defendants' State employment.  
Kilcoyne
, 204 Ill. App. 3d at 145.

The plaintiff contends the 
Kilcoyne
 court mistakenly assumed private physicians do not have the same power as State-employed physicians to involuntarily admit their patients.  I do not find that in 
Kilcoyne
.  The decision was based on the employees' duty to determine whether the power of the State should be used to confine a patient against his will at a State facility.  That is not a duty to treat.  I would follow 
Kilcoyne
.  

Here, the decision to release George was an administrative decision made on behalf of the State.  The fact that private institutions might make similar decisions does not matter.  It is the source of the duty that matters.  Here, the source is the power of the State.  I would affirm the trial judge's decision that sovereign immunity applies.

FOOTNOTES
1: 
The twelve-count complaint also alleged medical malpractice against Christ Hospital and several of its employees.  The trial court subsequently granted summary judgment in favor of these defendants and they are not parties to the instant appeal.